GENT *v.* STATE.

5-3529                                          393 S. W. 2d 219

Opinion delivered May 24, 1965.

[Rehearing denied September 20, 1965.]

*Robert C. Downie, Edwin E. Dunaway, Gregory & Claycomb,* for appellant.

*Bruce Bennett,* Attorney General, By: *William L. Patton, Jr.,* Asst. Atty. General, for appellee.

CARLETON HARRIS, Chief Justice. This appeal is from a Decree of the Jefferson Chancery Court, holding that certain magazines were obscene. The court enjoined the appellants from sending, bringing, or causing to be brought, into Jefferson County for sale, exhibit, or gift, any of these magazines, and ordered them destroyed. Jurisdiction was retained to determine whether any future issues are obscene, and appellants were . "notified that any future distribution of obscene publications, as set out, and found above, to be obscene, will also be restrained and enjoined and magazines will be removed." Included in the injunction were W. E. Burnham, Jr., county distributor of the magazines, and John Nickell, operator of a newsstand, which sold the magazines. The particular publications held to be obscene were *Swank, Gent, Modern Man, Bachelor, Calvalcade, Gentleman, Ace,* and *Sir.*[1]

The case arose upon complaint of the Prosecuting Attorney that the magazines were obscene, and in violation of Act 261 of the General Assembly of 1961 (Ark. Stat. Ann. § 41-2713-2728 [Repl. 1964]). The Chancellor impaneled, on motion of the state, an advisory jury, which, at the conclusion of an extended trial, unanimously found all magazines listed to be obscene. The court also found the magazines to be obscene, and issued its injunction. From the decree so entered, appellants bring this appeal.

One preliminary matter needs to be disposed of. The court refused to permit *Gent* to file an answer, hold-

---

[1] Actually, this court would be justified in dismissing the appeals because of non-compliance with Rule 9. We recognize that the contents of the magazines could not be fully abstracted, but we know of no reason why copies of each magazine offered in evidence could not have been furnished for each judge to examine. The inconvenience occasioned by seven different judges examining the one copy of each magazine is obvious. However, because of the importance of, and interest in, the case, we have separately inspected the exhibits in order to reach a determination on the merits of the litigation.

ing that the answer had not been tendered in time, and the judgment, as to this publication, was taken by default. We think the court erred. General counsel for the publication of *Gent,* in New York, wired the court on March 11, 1964, asking for a continuance, for the purpose of obtaining a suitable counsel. The Chancellor replied by letter, acknowledging the telegram, and stating, ''The cause was continued yesterday to be heard April 28, at 9:30 A.M.'' Local counsel was subsequently retained, and tendered a response on April 24. We think the Chancellor's reply, which neither denied the request, nor indicated that the court had no authority to grant same, could well have been taken by New York counsel to mean that *Gent* had until April 28 to file an answer. Accordingly, appellant's request that it be made a party to this appeal, and that its argument on the merits of the appeal be considered by this court, is granted.

For reversal, seven alleged errors are asserted; however, some of these errors relate to the selection of, and instructions given to, the jury. Error is also asserted because of the court's refusal to admit into evidence other magazines and articles, as a matter of comparison, and the refusal to permit counsel to inquire from the state's witnesses whether they considered these other publications obscene. However, during oral argument before this court, counsel for all appellants requested that we make a determination on the merits, *i.e.,* that we decide whether the magazines are obscene, rather than remand the case because of error committed during the trial. We therefore, do not consider the alleged errors heretofore mentioned. Suffice it to say that we agree that procedural error was committed, but in compliance with appellants' request, we disregard legal mistakes committed in selecting and instructing the jury, and proceed to a discussion of the principal issue.[2] In doing so, we enter into a field marked and characterized by uncertainty. In fact, we know of no area of the law in which there is more confusion, and the most

---

[2] A jury in Chancery Court acts in an advisory capacity only, the court not being bound by jury findings. In this case, both the jury and the Chancellor reached the same conclusion.

recent opinion handed down by the nation's highest court, rather than contributing to clarity, has actually compounded the confusion.

In 1957, the United States Supreme Court decided the case of *Roth* v. *United States,* 354 U. S. 476. After holding that obscenity is not within the area of constitutionally protected speech or press, the court stated:

"The early leading standard of obscenity allowed material to be judged merely by the effect of an isolated excerpt upon particularly susceptible persons. *Regina* v. *Hicklin* .[1868] LR 3 QB 360. Some American courts adopted this standard but later decisions have rejected it and substituted this test: *whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest.*[3] The Hicklin test, judging obscenity by the effect of isolated passages upon the most susceptible persons, might well encompass material legitimately treating with sex, and so it must be rejected as unconstitutionally restrictive of the freedoms of speech and press. On the other hand, the substituted standard provides safeguards adequate to withstand the charge of constitutional infirmity."

Following this decision, a number of states, through their legislatures, adopted the italicized standard. In 1961, the Arkansas General Assembly passed Act 261, which defines the word, "obscene," in the exact language set forth in the *Roth* case.

Appellants, for reversal, rely upon the more recent case of *Jacobellis* v. *Ohio,* 378 U. S. 184, and assert that this case makes clear that the "contemporary community standards," mentioned in *Roth,* actually refers to a "national" community, rather than a "local" community. Appellants vigorously argue that *Jacobellis* determined conclusively that the "national community standard" must be applied. We cannot accept this contention, since it does not appear that five judges, constituting a major-

---

[3] Emphasis supplied.

ity of the court, agreed upon the "national community" standard. The case was decided by a six to three vote, in which the lower court was reversed. There was no court opinion. Mr. Justice Brennan announced the decision, and wrote an opinion. Mr. Justice Goldberg concurred in Mr. Justice Brennan's opinion, but also filed a separate opinion of his own. Justices Douglas, Black, and Stewart concurred in the judgment of reversal, the first two on the basis that the Constitution does not permit censorship at all, and Mr. Justice Stewart, in a separate opinion, stating that the constitution only permits censorship of "hard core pornography;" further, "I shall not today attempt further to define the kinds of material I understand to be embraced within that short-hand description; and perhaps I could never succeed in intelligibly doing so. But I know it when I see it, and the motion picture involved in this case is not that." Mr. Justice White concurred in the judgment for reversal, without expressing a reason. The Chief Justice, joined by Justice Clark, in a dissenting opinion, rejected the national standard, which Justices Brennan and Goldberg stated the court must apply. Mr. Justice Harlan likewise dissented, saying:

"* * * The more I see of these obsenity cases the more convinced I become that in permitting the States wide, but not federally unrestricted, scope in this field, while holding the Federal Government with a tight rein, lies the best promise for achieving a sensible accommodation between the public interest sought to be served by obscenity laws and protection of genuine rights of free expression. * * *"

Thus, it appears that only two justices of the prevailing six adopted the national community standard. It is therefore evident that a majority of the court, whatever may be the thinking, have not flatly said that the national standard must be applied. Much has been written about the *Jacobellis* case, and we think one of the

most comprehensive articles (or notes) appears in 40 Notre Dame Law., P. 1 (Dec. 1964)[4] The article states:

"According to the opinion of Mr. Justice Brennan in *Jacobellis* v. *Ohio*, the Supreme Court itself must weigh and decide the issues in obscenity cases; it must decide whether the disputed material is obscene; and it must decide this according to the standards of the community, that is, the whole country—all 50 States. In other words, the Court must apply a national standard. This note is addressed primarily to that opinion."

After pointing out that, though critical, the writers intend nothing derogatory toward the court or its individual members, it is further stated:

"Indeed, it is precisely because of our respect that we venture to suggest what seems to promise a way out of the *total confusion* which envelopes the problem of obscenity as a result of the opinions in some recent Supreme Court cases and the entire absence of opinion in others."

The article then notes that Justice Brennan sets out in his opinion that the Supreme Court must ultimately decide when a particular work is obscene, and the article poses the question of the logic of the court itself deciding obscenity cases when it does not decide for itself matters of equal or greater importance; for instance, whether a convicted murderer, when firing a fatal shot, was capable of distinguishing right from wrong, or was under a compulsion so strong that he was without power to resist it. These matters, of course, are determined by a jury. It is the opinion of the writers of the article that the Supreme Court, in deciding that it is the duty of the court to make its own independent decision of the issues in obscenity cases, has committed itself to an impossible task.

---

[4] The note was prepared by Joseph O'Meara, Dean of the Notre Dame Law School, and Thomas L. Shaffer, Assistant Professor of Law of the Notre Dame Law School.

"Not only has the Court assumed an impossible task, that is, to make its own independent decision of the issues in obscenity cases, but, in so doing, if the opinion of Mr. Justice Brennan is followed, it must apply an absolutely impossible test, that is, the standard in such matters of the Nation as a whole.

"As a matter of *fact* there is no national community standard. Large cities are much more permissive, by and large, than smaller towns and farming areas, and standards vary not only according to the size of the community but according to geographical location as well. * * *

"* * * And to go back to population, the standard varies from one large city to another. Thus, it appears that practices are permitted in the Nation's capital which are not tolerated in New York or Chicago.

"Further examples of the *fact* that standards vary from one community to another come readily to mind. Consider, for instance, the State of Nevada where gambling is legalized; where prostitution flourishes openly; and where divorce is easier to obtain than almost any other place in the present-day world. Are the morals and mores of that State no different from the morals and mores of, say, New England? * * *

"Confronted, as it is, by conflicting standards, lax in one community, strict in another, what is the Court to do? If it succeeded in imposing the standard of, say Washington, D. C., or of Reno, on the rest of the Country, it would be imposing a standard which is repugnant to perhaps a majority of the people of the Nation, particularly in the smaller towns and rural areas. And, of course, the reverse would be equally true.

"Even as regards the big cities, there is no 'community standard.' There are many and conflicting standards; and our legal institutions provide judges no

mechanism for ascertaining what they are, sorting them out and selecting one as controlling. The inevitable effect of this is that each member of the Court will apply his own standard. But that is historically the role and function of the jury. The jury is the mechanism provided by the common law for determination of questions involving the presence or absence of due care, reasonableness, prudence, decency and other concepts reflecting the common sense and/or conscience of a community. And the jury can do it better than the members of our highest tribunal. But, of course, the jury could not and would not reflect a *national* standard, because such a standard is a fiction pure and simple."[5]

Summarizing the views expressed in the several *Jacobellis* opinions, it is obvious that the court, in the final analysis, determines obscenity cases *de novo,* but the standard applied is not so readily apparent.

The stories and pictures in the eight magazines in question, in the main, deal with the theme of sex. The pictures generally portray side or back views of young females, totally unclad, or front views of the girls, unclad from the waist up. A large number of the stories, or articles, deal with adultery or fornication, the number varying in the several magazines.[6] In fact, all can be classified under the general term, "girlie" magazines. A few examples of the type of stories, or articles, found will illustrate the general theme. For instance, the following is an excerpt from a story in *Ace,* entitled, "On the Level:"

"The window was open.

"I tugged at the shade and it snapped up with a swish, and there I was gazing at the two most perfect

---

[5] 13 Kan. L. Rev., P. 117, (1964) also contains an interesting article entitled "Obscenity: The Search for a Standard."

[6] No effort is made in appellants' briefs to point out differences in the articles, or pictures, from the different magazines, i.e., one magazine might possibly contain obscene material, but another particular magazine does not. It is simply the contention of appellants that none of the magazines can be classified as obscene, under the law as declared by the United States Supreme Court; a separate argument is presented by *Gent,* which is represented by different attorneys.

breasts in creation. Full they were, and round and firm, and by any criterion, utterly fantastic. She was powdering them with a fluffy pink puff, and as the shade flew up she paused in mid-puff. * * *

"She was lovely, but there was something wrong in the way she looked, in the lilt of her head, in the raven shimmer of her lustrous black hair, in the feline greeness of her eyes. And then I knew what it was—she was on her feet.

"Just as Goya's nudes would look ludricous standing up, and Botticelli's undraped beauties would look foolish except lying down, so this chick was made for the horizontal; and while she was great standing upright, I knew that on her back she'd be sensational. * * *

"We reacted to one another as if we were oppositely magnetized. My mouth was on her lips—moist, full, red lips. I've a thing for lower lips. The chick can be a dog, as long as the lower lip is a full, soft one.

"She intertwined herself about me, nudely white from cascading raven hair to scarlet toenails, and the sensation was not of this world. I could feel the sleek perfection of her body through my clothes, her ruby-tipped breasts pushing against me impatiently. I felt her soft arms around me, under my arm-pits, as she hooked her exquisitely manicured hands at my shoulders, thrusting her dancer's belly toward me.

"And I suddenly realized that we were standing by the open window. Not only could we be seen in sharp relief against the white apartment walls by everyone in neighboring apartments, but my colleague, a fellow student, might come looking for me any moment. I pried loose, and the chick let go with low moans that set my hair climbing. I'd been right. She was the type that digs. What might have been foolish prematurity had turned out to be telling perception. She was a chick who thought 'horizontally.' * * *

"* * * What it was with her, I couldn't quite pin down, but she never made love in the dark, and always

with the blinds up—and once while there was a girl friend in the living-room. It got to be a bit embarrassing. But she was a cool sketch, and she knew how to use that horizontal body of hers—*so well*. I didn't really give a damn.''

In *Bachelor*, a particularly obnoxious (to us) article appears, entitled ''Those Free-Loving Coeds — Why Every Man Should Go To College.'' The opening paragraphs of this article (giving some idea of the nature of the remainder of the story) are as follows:

''If you're a young man with plenty of initiative, zip and get-up-and-go, the place to be right now is in college. Just think of all the advantages. I don't mean the ordinary ones of being exposed to the great minds of science and the arts, learning from brilliant instructors and preparing yourself for a career. The advantages I'm talking about are even more important and have to do with meeting the most willing group of coeds ever to invade the campus scene.

''The fact is, today's crop of college girls are not only loving more—but they are more lovable, too. And it all goes to give Joe College fonder memories of his Alma Mater to take with him when he graduates.

''Only recently, for example, an anonymous senior from a large coed university in the middle-West was asked by an interviewer why his school had so few panty-raids in comparison with some of the all-male Eastern schools.

''The senior grinned. ''Why *should* we have panty raids here?' he asked. 'They are all right for guys who can't get enough of the real thing. The girls in this school, though, keep us perfectly happy and content.' ''

Again, in *Ace*, the story, ''39 Inches of Femme Fatale,'' commmences as follows:

'' 'You are a bitch!' Louise said.

'' 'Yes, aren't I?' Carla Sanders laughed indulgently. 'And right here is 39 uptilted inches of bitchiness that

I intend to make pay off.' Insultingly she cupped her hands under her breasts.''

From *Cavalcade,* ''The Wrong Chimney:''

'' 'Shh,' she murmured.

''She lifted his hand to cup her full breast, and turned a bit, her eyes closed, lifting her face to kiss him on the mouth, her rich lips parted. His hand felt her warm softness and moved of itself, amorously, his other hand automatically reached behind her, caressing, his mouth felt her warm lips and the tip of a tongue going into his, darting, exploring.

''She drew her face back a little, breathing fast, her eyes still closed. He looked at the lovely features he'd dreamed of so often looking just this way, with the same eager, surrendering expression, and reached for her again.

'' 'You were late,' she said softly. 'I was afraid . . . Don . . .'

''She stopped talking as her mouth again met his. Then it penetrated . . . Don, she'd said. He started to draw back but he couldn't, he wanted her too much. He raised his hand a little to the back of her proud lovely neck and kept her mouth pressed to him. Then he thought . . . polite . . . proper . . . courteous . . . an officer and a gentleman, and pulled his seeking lips from her eager mouth.

'' 'Hurry,' she said, her eyes still closed. 'We only have a few minutes.' ''

We recognize that articles, or stories (and pictures) dealing with sex are not necessarily obscene. The material only becomes obscene when it deals with sex in a manner appealing to prurient interest. Of course, there are frequently pictures or drawings in health and art magazines, which might be said to deal with sex, but such magazines would not be considered obscene, because their *dominant theme* relates to health or art. In Lock-

hart and McClure, ''Censorship of Obscenity,'' 45 Minn. L. Rev. 5, page 91, we find:

''In applying the requirement that material must be judged as a whole and by its dominant theme, courts have often spoken of the relevance of the objectionable parts to the dominant theme. If the objectionable parts are relevant to the dominant theme, courts ordinarily have found the material not obscene. But if the parts are irrelevant to the theme and independently obscene themselves, courts have usually found the material obscene . . .''[7]

There are articles, or stories, in these eight magazines, which would not be considered obscene, but, in viewing the total contents of each of these publications, we think it can well be said that their dominant theme appeals only to the coarse and base in man's nature, and any literary merit is entirely coincidental. It is evident that the portrayal of sex in these magazines appeals to the prurient interest.

Perhaps we lack sophistication, but, to us, articles, which, for example, indicate that our colleges are simply play-grounds for the indulgence of sexual pleasures, are completely obscene, and totally without any redeeming feature. Of course, we are not cognizant of the standards of Washington, New York, Chicago, or San Francisco,[8]

---

[7] It is mentioned also that some pornographers "may seek to disguise the pornographic nature of the dominent theme of the materials they assemble, by the inclusion of some material that is clearly legitimate."

[8] The press carried an account, datelined San Francisco, May 9 of this year, as follows: "Bosoms were bared again Saturday as bawdy North Beach celebrated the acquittal of its topless dancers and fashion models.

"Two separate juries brought in the innocent verdicts Friday, vindicating nightclub owners and their busty showgirls of police charges of lewd conduct."

It is interesting to note that the trial judge, in directing the jury to return a verdict of not guilty, stated: "No police officer can substitute his personal feelings of what is right or wrong.

"The test is not what a couple of people feel. The test is what the people of San Francisco feel."

This occurrence points up the difference in the standards over the nation, for women appearing in this state in similar "attire" (or lack of it) would be in violation of the criminal statutes.

nor is there any way for us to know the "standard" of the nation at large, but we think the evidence clearly established that the contents of the magazines in question are not compatible with the contemporary community standards in Pine Bluff, Arkansas.[9]

We know not what the United States Supreme Court may hold as to these magazines, or the validity of Act 261. Let it here be said that, if a firm and clear guideline had been established, we would certainly follow it, for we recognize that the rulings of the United States Supreme Court are controlling, and, in conformity to the legal process, must be adhered to. But, as previously pointed out, we find no definite determination by a court majority that a "national standard" shall apply.

Appellants contend that the injunction granted by the Chancellor is clearly illegal in that it bans future issues of the magazines. The Attorney General concedes that the dissemination of future issues of a publication may not be enjoined simply because its past issues have been found to be offensive. But we, like the Attorney General, do not find that the injunction operates to that extent. The decree clearly provides that the particular issues of the pertinent magazines (introduced into evidence) shall not be sold, but it does not enjoin future issues. The court simply finds that future distribution or sale of future issues of the magazines will be enjoined upon a showing that such magazines are obscene. This means, of course, that a hearing (or trial) would be held before any order was rendered. Actually, the trial court would have the authority, upon proper complaint being made, to hold such a hearing, irrespective of whether reference was made to future issues in the present decree.

We do not agree with appellants that Act 261, as here applied, violates the First and Fourteenth Amendments to the Constitution of the United States, as abridg-

[9] The State's witnesses were Reverend J. W. Watson, Pastor of Lakeside Methodist Church in Pine Bluff, Carl Welch, a business leader of the city, B. E. Whitmore, County School Superintendent of Schools, Reverend Pirtle, Pastor of Second Baptist Church of Pine Bluff, Arthur C. Hendrix, Assistant Probation Officer of Jefferson County, and Norman Young, Chief of Police of the City of Pine Bluff.

ing freedom of speech and press, nor that it deprives appellants of their property without due process of law.

The decree is modified to the extent that appellant *Gent* is made a party to this appeal, and, with such modification, said decree is affirmed.

Justices Johnson concurs. Justices George Rose Smith and Robinson dissent.

SAM ROBINSON, Associate Justice (dissenting). Not only is it the duty of the United States Supreme Court to uphold the Constitution, but it is the duty of this court, and every court in the land, to support and defend the Constitution. Of course, any document as important as the Constitution has to be construed. It would be utterly impossible to write a Constitution for a great nation that would need no construction by courts of competent jurisdiction, and no one now questions the jurisdiction of the U. S. Supreme Court to construe the Constitution.

The First Amendment, as construed by the U. S. Supreme Court, among other things, protects the freedom of speech and freedom the press. The Supreme Court has construed this Amendment many times but the majority of our court, in the case at bar, has cited only two cases on that point; neither of the cited cases sustain the majority opinion, and no other authority is cited sustaining the majority view. One of the cases cited by the majority is *Roth* v. *U. S.*, 354 U. S. 476. The facts in the Roth case are not shown, therefore it is not known whether it is analogous with the case at bar.

The other case is *Jacobellis* v. *Ohio*, 378 U. S. 184. There, Jacobellis was convicted in the Ohio courts on two counts of possessing and exhibiting an alleged obscene film in violation of Ohio Statutes. The picture was a French film called "Les Amants" ("The Lovers"). The conviction was reversed by the U. S. Supreme Court. Here, the majority makes no attempt to point out any distinction between the Jacobellis case and the case at

bar. Otherwise, the majority has not shown how it can be said that the material in the case at bar is obscene and therefore not protected by the First Amendment, notwithstanding what the U. S. Supreme Court has said in the Jacobellis case.

In view of the fact that undoubtedly this case will go to the U. S. Supreme Court for a final decision, I see no point in elaborating on the construction placed on the First Amendment by the majority of our court, which is contrary to the construction of the Amendment by the U. S. Supreme Court in many cases, including *Times Film Corp.* v. *City of Chicago, et al.,* 355 U. S. 35; *One, Inc.* v. *Olesen, Postmaster of Los Angeles,* 355 U. S. 371; *Sunshine Book Co.* v. *Summerfield, Postmaster General,* 355 U. S. 372; *Kingsley International Pictures Corp.* v. *Regents of the University of the State of New York,* 360 U. S. 684; *Manual Enterprises, Inc.* v. *Day, Postmaster General,* 370 U. S. 478.

All of the foregoing cases are directly in point with the case at bar. There was a conviction in each case of violating some statute prohibiting dissemination of obscene material. In each case the alleged obscenity involved was lewd, lascivious, and perhaps shocking. In each case the conviction was reversed by the Supreme Court of the United States.

The majority has made no attempt whatever to distinguish the alleged obscene material in the case at bar from the material that was in issue in the foregoing cases. There is no effort to show that the material involved here is any more obscene than the material that the Supreme Court has held to be protected by the First Amendment.

In my opinion the decision in this case will be reversed by the U. S. Supreme Court. I, therefore, respectfully dissent.

I am authorized to say that Mr. Justice George Rose Smith joins in this dissent.