Russ **MEYER**, Eve Productions, Inc., Jack Vaughan and Jack Vaughan Productions, Inc., Plaintiffs,

v.

T. Edward **AUSTIN**, as State Attorney for the Fourth Judicial Circuit in and for the State of Florida, and Dale Carson, as Sheriff of Duval County, Florida, Defendants.

No. 69–678–Civ.–J.

United States District Court, M. D. Florida, Jacksonville Division.

July 22, 1970.

Dissenting Opinion July 23, 1970.

As Modified on Denial of Rehearing Aug. 14, 1970.

Robert P. Smith, Jr., Bedell, Bedell, Dittmar, Smith & Zehmer, Jacksonville, Fla., and Elmer Gertz, Chicago, Ill., for plaintiffs.

Charles W. Arnold, Asst. State Atty., Jacksonville, Fla., for defendants.

Edward M. Booth, Jacksonville, Fla., for amicus curiae, Citizens for Decent Literature.

Before SIMPSON, Circuit Judge, and McRAE and YOUNG, District Judges.

## OPINION

WILLIAM A. McRAE, Jr., District Judge:

Plaintiffs have brought this action seeking injunctive, declaratory, and other relief, and in particular challenging the constitutionality of the Florida obscenity statute, section 847.011.[1] A three-judge court was convened pursuant to 28 U.S.C. §§ 2281, 2284, and evidence was taken at the hearing held January 17, 1970. The Court has jurisdiction under 28 U.S.C. §§ 1331, 1332, 1343, 2201, and 42 U.S.C. § 1983, and it finds that abstention is not appropriate because of the authoritative rulings of the Florida state courts[2] and because of the substantial first amendment claims raised here. Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967).

The parties have stipulated to the facts relevant to the seizure of the film "Vixen" at about 3:00 P.M. on October 3, 1969. (See Appendix II). Criminal prosecution of the exhibitor following that seizure was enjoined by this Court in the case of Mandell v. Carson, 309 F.Supp. 326 (M.D.Fla., 1969) (temporary restraining order) because no prior adversary hearing had been obtained. A civil proceeding against the exhibitor Mandell and against the film followed in state court seeking, under section 847.011, a temporary restraining order against the further showing of the film until a final determination of the state proceeding, and seeking to have the film declared obscene and to have it confiscated and destroyed. Florida ex rel. Austin v. Mandell, No. 69–8106–H (4th Judicial Cir.Ct., Duval Cty., Fla.). A petition for removal of that suit on diversity grounds is presently pending in

---

1. The statute challenged, Florida Statutes, section 847.011 (1967) is attached as Appendix I.

2. *See* sections 1–3, *infra*.

this Court, No. 69–679–Civ–J (M.D.Fla.). (The state circuit court permitted the intervention of Jack Vaughan, a Georgia citizen, and Jack Vaughan Productions, Inc., a Georgia corporation, and defendant Mandell abandoned the suit).[3] The present suit was filed at the same time as the petition for removal, on October 30, 1969. Subsequently, on November 17, 1969, a temporary restraining order was entered against further acts by defendants to enforce section 847.011 against the film "Vixen" pending consideration by this Court.

Plaintiff Russ Meyer is the director and producer of "Vixen" and principal stockholder and chief executive officer of plaintiff Eve Productions, Inc., owner of the print involved. Jack Vaughan is the sole stockholder and chief executive officer of plaintiff Jack Vaughan Productions, Inc., which distributes the film in Florida, Georgia, Alabama, and Tennessee. Defendant T. Edward Austin is the State Attorney for the Fourth Judicial Circuit of Florida, and defendant Dale Carson is the Sheriff of Duval County, Florida. Following the hearing, Citizens for Decent Literature, Inc., an Ohio corporation, was permitted to file an extensive amicus curiae brief on February 13, 1970, and a supplement thereto on March 18, 1970.

## FINDINGS OF FACT

In addition to the facts stipulated regarding the initial seizure without a prior adversary hearing (Appendix II), and the subsequent history of this case detailed above, it was conclusively proven at the hearing that the statewide distribution and exhibition of the film was severely "chilled" and ultimately halted as a result of the state's seizure on October 3, 1969, and the subsequent prosecutions.

At the hearing, testimony indicated that by October 3, 1969, approximately 225,000 persons had seen the film in the four-state area served by plaintiff Jack Vaughan Productions, Inc. In Jacksonville, some 23,000 persons of the age of eighteen or over had seen the film at the Five Points Theatre during the five weeks before its confiscation on October 3. Following the injunction of state prosecution, the film was shown to 7,000 additional patrons in six days. The exhibitor stated that the film rated as one of the three or four most financially successful films of the year. At the time of the Jacksonville seizure, three theatres in Miami and one in Gainesville were showing the film.

Although there had been no outright cancellations before October 3—the date of the seizure—a four-week booking, made final only the day before, at the Florida Theatre in Tampa was cancelled on the afternoon of October 3 because of the Jacksonville seizure. Theatres in Jacksonville (besides the Mandell theatre) and Winter Park cancelled availability play dates because of the seizure, and theatres in Daytona Beach and Key West cancelled October bookings for the reason that the film had been seized in Jacksonville and because the exhibitors did not wish to find themselves in legal difficulties. A Neptune Beach theatre did not show the film as scheduled; and three theatres in Miami cut short otherwise successful runs, and another cancelled a booking for October 16–22. A Lake City theatre was allegedly threatened with prosecution by the state's attorney and cancelled a November booking. Thus, in the entire state, only theatres in Melbourne and Cocoa Beach risked playing a full run between the seizure and the January hearing. One showing in Gainesville, begun before the hearing, finished with-

---

3. There is consequently no 28 U.S.C. § 2283 problem in this suit, since there is at present no pending state court proceeding, either civil or criminal. Thus, Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), and Sheridan v. Garrison, 415 F.2d 699 (5th Cir., 1969), cert. denied, 396 U.S. 1040, 90 S.Ct. 685, 24 L.Ed.2d 685 (1970), are not involved in the case sub judice.

out interruption.[4] Subsequent attempts by plaintiffs, before the hearing, to book the film were unsuccessful, except that, at the time of the hearing, a date was scheduled to begin in late February, 1970, at four Wometco theatres in Miami. However, on February 9, Wometco cancelled with the comment " * * * waiting for the Jax decision." Exhibit 8 shows that as many as 34 play dates in one week were cancelled during the month of October alone. In all, at least eleven different theatres cancelled because of the seizure. The inherent flexibility of theatre booking arrangements makes it difficult to determine exactly how many play dates were lost after the month of October. In light of the apparent commercial success the film enjoyed until October 3, however, it is reasonable to infer that the pronounced chilling effect of the prosecution caused a loss of numerous other booking opportunities after October. For the reason that interest in a film is a perishable commodity, irreparable damage may have occurred to plaintiff Russ Meyer's first amendment right of unfettered expression as creator and distributor of the film and to the other plaintiffs' constitutional rights as well.[5] Further, it is notable that most of these cancellations were precipitated by the initial unconstitutional seizure in the criminal prosecution before the state attempted, on October 9, 1969, to proceed in a civil action by conducting a prior adversary hearing.[6]

## CONCLUSIONS OF LAW

Plaintiffs claim that defendants, acting under color of the Florida obscenity

4. After the hearing, there was one showing, without interruption, of a 16 mm. print of the film at Deerfield Beach, Florida, in a sixty-seat theatre during part of February, 1970. Deerfield Beach is not within either the Middle District or the Fourth Judicial Circuit. This isolated run does not overcome the extensive chilling demonstrably attributable to the unconstitutional initial seizure and following prosecutions of the film, exhibitor, and the plaintiffs in this action. No future bookings by any theatre in the State of Florida had been made as of February 20, 1970, although one run later began, but was promptly halted by state action. *See* note 6 *infra*.

5. Plaintiff Russ Meyer asserts his own first amendment right of expression as director and producer of "Vixen," the first amendment right of the public to receive protected speech (*see* Stanley v. Georgia, 394 U.S. 557, 564, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969)), and his rights to due process under the fifth and fourteenth amendments (both the prior adversary hearing contention and the no legitimate interest claim). Plaintiff Jack Vaughan asserts the first amendment rights of himself as distributor and of the public as recipient of protected expression, and his rights to due process. The two plaintiff corporations, Eve Productions, Inc., and Jack Vaughan Productions, Inc., may be unable to assert first amendment rights themselves, Hague v. C. I. O., 307 U.S. 496, 514, 59 S.Ct. 954, 83 L.Ed. 1423 (1939), but they can per-

haps assert the first amendment rights of the public to receive protected expression, and without question can assert the due process contentions asserted by Meyer and Vaughan. *See* Grosjean v. American Press Co., 297 U.S. 233, 244, 56 S.Ct. 444, 80 L.Ed. 660 (1936); Leslie Tobin Imports. Inc. v. Rizzo, 305 F.Supp. 1135 (E.D.Pa., 1969).

6. After the hearing on January 17, 1970, plaintiffs on March 11 moved the Court for an order to show cause, to add a party defendant. and to modify the temporary restraining order, alleging that a showing of the film in Gainesville beginning March 6 was stopped by a temporary restraining order issued March 10 in a civil action brought in the Eighth Judicial Circuit of Florida (which includes a portion of the Middle District) under section 847.011 against M & W Theatres, Inc., the exhibitor of a print of "Vixen" owned by the present plaintiffs. This order was allegedly issued without a prior adversary hearing and with attendant press publicity. It was further alleged that defendant Austin, state attorney for the Fourth Circuit, acted in concert with the state attorney for the Eighth Circuit, and in violation of this Court's temporary restraining order of November 17, 1969, in the present case. The hearing scheduled for March 13 was cancelled at the request of the present plaintiffs, presumably because an agreement was reached between the parties pending the release of this opinion.

statute, have severely chilled the exercise of their first amendment rights by impairing the distribution and exhibition of "Vixen" within the Fourth Judicial Circuit and elsewhere in Florida, see, e. g., Note, The Chilling Effect in Constitutional Law, 69 Colum.L.Rev. 808 (1969), and, furthermore, make five specific challenges to the Florida statute [7]: (1) the Florida statute is unconstitutional because it authorizes seizure of matter conceived by the state to be obscene before a prior, judicially supervised, adversary proceeding is held on the question of obscenity; (2) the Florida statute is unconstitutional because, as authoritatively interpreted by Florida courts, it prescribes an inappropriate local standard for the identification of obscenity; (3) the Florida statute is unconstitutional because neither it nor any other Florida statute, rule or practice, assures a prompt final judicial determination of "obscenity" on appeal; (4) the Florida statute is unconstitutional because it is overbroad in that it does not contain the requirement that material be without redeeming social value; and (5) the State of Florida has no legitimate interest in the suppression of allegedly obscene movies, shown exclusively to adults who, though not pandered to, are first informed of the content.[8]

This Court finds the Florida obscenity statute, section 847.011, unconstitutional in its entirety for the first three contentions made by plaintiffs; the fourth claim we find to be not an unconstitutional defect, but one which it is desirable to correct if a subsequent statute should be enacted; and the Court finds it unnecessary, in light of the ruling made here, to consider plaintiffs' fifth contention at this time.

*Standing*

Defendants have suggested in their trial brief, p. 16, that plaintiffs cannot claim a full measure of first amendment protection because their interests are diminished by being primarily commercial and private, instead of being personal and public, citing Carter v. Gautier, 305 F.Supp. 1098 (M.D.Ga., 1969) (*denying an injunction of a pending state criminal prosecution* as opposed to the relief sought here, declaratory judgment). This suggestion is inapplicable to plaintiff Meyer who asserts personal first amendment rights as the creator of "Vixen." As to the other plaintiffs, it is also without merit. The Fifth Circuit Court of Appeals stated persuasively, in Machesky v. Bizzell, 414 F.2d 283 (5th Cir., 1969):

\* \* \* First Amendment rights are *not private rights of the appellants so*

---

7. On February 13, 1970, an order was issued to show cause why this Court should not wait until the Supreme Court decided Batchelor v. Stein, 396 U.S. 954, 90 S.Ct. 428, 24 L.Ed.2d 419 (1969) (prob. juris. noted), appeal from 300 F. Supp. 602 (N.D.Tex., 1969) (3 judge court). Except for the fourth contention, these challenges are distinct from those in *Batchelor*, and the order to show cause is accordingly discharged.

8. These contentions are different from several that have been raised recently in other cases. The issues in the present case do not include the privacy rationale of the three-judge panel in Byrne v. Karalexis, 397 U.S. 985, 90 S.Ct. 1123, 25 L.Ed.2d 394 (1970) (prob.juris. noted), appeal from Karalexis v. Byrne, 306 F.Supp. 1363 (D.Mass., 1970); and the "right to read necessarily protects the right to receive" decision of United

States v. Thirty-Seven Photographs, 309 F.Supp. 36 (C.D.Cal.), appeal filed, No. 1475, 38 U.S.L.W. 3433 (U.S., Apr. 24, 1970); United States v. Lethe, 312 F. Supp. 421 (E.D.Cal., 1970). Neither is it at issue here whether criminal mens rea can be present for distribution or exhibition occurring before a prior adversary hearing determines probable cause that a film or book is obscene, or whether, in the alternative, one who sells or exhibits must do so at his own risk. In addition, this Court has not been presented with an attack specifically on section 847.011(1) (b), although it is somewhat similar to section 847.06(2), stricken as unconstitutional in Morrison v. Wilson, 307 F.Supp. 196 (N.D.Fla., 1969) (3 judge court); see Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243 (1969) (private possession of obscene matter constitutionally protected).

*much as they are rights of the general public.* "Those guarantees [of speech and press] are not for the benefit of the press so much as for the benefit of all of us. A broadly defined freedom of the press assures the maintenance of our political system and an open society." [citations omitted and emphasis added]. Id. at 289. Recent Decisions, 4 Ga.L.Rev. 610, 616–617 (1970).

■ The basis for the decision in Carter v. Gautier, *supra,* was that sufficient irreparable injury had not been shown to support injunctive relief against state prosecution where "private" first amendment rights were suppressed. Sheridan v. Garrison, 415 F.2d 699 (5th Cir., 1969), cert. denied, 396 U.S. 1040, 90 S.Ct. 685, 24 L.Ed.2d 685 (1970), held that, where freedom of expression is threatened or suppressed, any chilling of that expression constitutes irreparable injury per se sufficient to sustain injunctive relief against a statute challenged as being unconstitutional on its face affecting free speech in a *pending* state criminal prosecution affecting expression. *Id.* at 705–709. As noted in City News Center, Inc. v. Carson, 310 F.Supp. 1018, 1023 (M.D.Fla., 1970):

> [C]ommercial parties are inextricably involved in the production and distribution of much of the information now exchanged in our society, whether by television, radio, books, or newspapers. To deny these media standing to assert the public's interest in the free exchange of ideas and information, simply because they have a monetary interest, would be contrary to the fundamental purposes of the first amendment.

*See* United States v. Alexander, 428 F.2d 1169 (8th Cir., filed May 22, 1970). In the present case, no injunctive relief is sought involving a pending state proceeding, but only a declaratory judgment with injunctive relief from future prosecutions. We hold that plaintiffs' standing to bring this action is not diminished by their commercial interest in the film.

### 1. *Provision for Ex Parte Injunction*

■ Florida Statutes, Section 847.011 (7) (b) (1967), provides for the issuance of an ex parte injunction, without notice, of a threatened violation of the obscenity statute:

> (7) (b) After the filing of such a complaint, the judge to whom it is presented may grant an order restraining the person complained of until final hearing or further order of the court. [The statute further provides that "whenever" a hearing is requested, it shall be held promptly and after due notice] * * * provided, however, that such notice shall be dispensed with when it is manifest to such judge, from the sworn allegations of the complaint or the affidavit of the plaintiff or other competent person, that the apprehended violation will be committed if an immediate remedy is not afforded.

■ In the present case, defendants used this ex parte procedure initially, thereby giving plaintiffs standing to complain of the provision's unconstitutionality. Florida courts have sanctioned the use of this subsection, *e. g.,* South Florida Arts Theaters, Inc. v. Florida ex rel. Mounts, 224 So.2d 706 (Fla. 4th D.C.A., 1969), cert. denied, 229 So.2d 871 (Fla., 1969). In the pretrial stipulation and in defendants' trial briefs, defendants expressly concede that this provision for an ex parte injunction is unconstitutional, and we so hold.[9] *E. g.,* A Quantity of Copies of Books v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964); Marcus v. Search Warrants, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961); Tyrone, Inc. v. Wilkinson, 410 F.2d 639 (4th Cir., 1969) (film), cert. denied, 396

9. Although this one subsection might be severed from the remainder of the statute, *see* Morrison v. Wilson, 307 F.Supp. 196, 199 (N.D.Fla., 1969) (3 judge court); State v. Reese, 222 So.2d 732 (Fla., 1969), the other contentions discussed below require holding the entire statute invalid.

U.S. 985, 90 S.Ct. 477, 24 L.Ed.2d 449 (1969); Metzger v. Pearcy, 393 F.2d 202 (7th Cir., 1968) (film); City News Center v. Carson, 310 F.Supp. 1018 (Md. Fla., 1970); Mandell v. Carson, 309 F. Supp. 326 (M.D.Fla., 1969) (the first order relating to the facts in the present case). It must be noted that a prior adversary hearing to determine whether probable cause exists for arrest or seizure is constitutionally required not to make prosecutions of obscenity difficult for the state, but rather to guard against over-zealous prosecution of *protected* expression. This panel, in a case heard the same day as the present one, rejected any distinction between a mass seizure of books and the seizure of a single print of a film. Carroll v. City of Orlando, 311 F. Supp. 967 (M.D.Fla., 1970) (3 judge court) (Young, J. dissented), (appeal

was taken to U.S.Sup.Ct., but was withdrawn Apr. 27, 1970); *see, e. g.*, Bethview Amusement Corp. v. Cahn, 416 F.2d 410 (2d Cir., 1969), cert. denied, 397 U.S. 920, 90 S.Ct. 929, 25 L.Ed.2d 101 (1970); Vergari v. 208 Cinema, Inc., 397 U.S. 934, 90 S.Ct. 941, 25 L.Ed.2d 114 (1970) (cert. denied). The extensive chilling caused by the seizure of a print of a film is substantiated by the facts in this case where there were only six prints of the film in 1969 in the entire state.[10]

2. *Improper Interpretation of "Contemporary Community Standards"*

Four years after the decision in Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1967), the Florida Legislature adopted the *Roth* test in sub-

10. The amicus curiae brief, adopting a position abandoned by defendants, strongly urges that a prior adversary hearing is not required before the state may proceed against speech or expression by seizure or arrest, and it relies upon the Supreme Court affirmance of Milky Way Productions, Inc. v. Leary, 305 F.Supp. 288 (S.D.N.Y., 1969), aff'd per curiam, 397 U.S. 98, 90 S.Ct. 817, 25 L.Ed.2d 78 (1970). We view that case, despite its choice not to require a prior adversary hearing, as having been affirmed primarily because of plaintiffs' failure to seek federal injunctive relief until "a summer and beyond" had passed after the chilling of expression began, and because plaintiffs "acquiesced [from] May and June [until mid-August] in the postponement of the pending state criminal proceedings." *Id.* at 291; *cf.*, two-month delay before requesting declaratory relief in Holden v. Arnebergh, 265 Cal.App.2d 87, 71 Cal.Rptr. 401 (Cal., 1968), appeal dismissed, 394 U.S. 102, 89 S.Ct. 926, 22 L.Ed.2d 112 (1969). Whatever delay has been caused in the present case has not been attributable to plaintiffs, who acted promptly and repeatedly urged a speedy conclusion to the case. Since the affirmance of *Milky Way*, the Supreme Court has affirmed, per curiam, Gable v. Jenkins, 397 U.S. 592, 90 S.Ct. 1351, 25 L. Ed.2d 595 (1970), appeal from 309 F. Supp. 998 (N.D.Ga., 1969), a decision that unequivocally requires a prior adversary hearing before seizure. In any event, *Milky Way* deals only with an

arrest, and not a seizure as in the present case.

A panel of the Fifth Circuit Court of Appeals recently stated in a federal prosecution (involving a seizure of eleven books and one deck of playing cards) that the affirmance of *Milky Way* "confirms" that a prior adversary hearing is unnecessary. United States v. Fragus, 428 F.2d 1211, supplementing, 422 F.2d 1244 (5th Cir., 1970) (per curiam). The result and reasoning in that decision is tenable only as it holds that Fragus waived all non-jurisdictional defects by his knowing and intelligent guilty plea. Accordingly, the comments in *Fragus* about *Milky Way*, Stanley v. Georgia, *supra*, the constitutionality of 18 U.S.C. § 1462, the lack of a prior adversary hearing before arrest or seizure, and United States v. 37 Photographs, *supra*, are not essential to the issues raised in that case.

In addition, the amicus brief attempts to undercut the validity of Redrup v. New York, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967), and A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966), on the basis of the state court decision in Cain v. Commonwealth, 437 S.W.2d 769 (Ky.Ct.App., 1969); that case was reversed by the United States Supreme Court after the amicus brief was filed. Cain v. Kentucky, 397 U.S. 319, 90 S.Ct. 1110, 25 L.Ed.2d 335 (1970) (per curiam).

section 10 of the statute under attack here:

> (10) For the purposes of this section, the test of whether or not material is obscene is: Whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest.

As subsequently interpreted in Jacobellis v. Ohio, 378 U.S. 184, 192–195, 84 S.Ct. 1676, 12 L.Ed.2d 763 (1964), and as *stipulated* by defendants to be the controlling interpretation,[11] the phrase "contemporary community standards" means a national standard of contemporary values. A national standard has been followed by state courts outside of Florida in post-*Jacobellis* cases, *e. g.,* State v. Locks, 97 Ariz. 148, 397 P.2d 949 (1964); State v. Vollmar, 389 S.W.2d 20 (Mo., 1965). In two cases a local standard was used and they were reversed, for that or other reasons, by the United States Supreme Court: Gent v. State, 239 Ark. 474, 393 S.W.2d 219 (1965), (applying standards of Pine Bluff, Ark.), rev'd sub nom. Redrup v. New York, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967); State v. Henry, 250 La. 682, 198 So.2d 889, 895 (1967) (applying standards of the Parish of Iberia), rev'd per curaim, 392 U.S. 655, 88 S.Ct. 2274, 20 L.Ed.2d 1343 (1968).

▮ The Florida courts, however, contrary to the national standard established in *Jacobellis* have authoritatively construed the *Roth* "community" to be a local or countywide area, and federal courts must accept the state view of a state statute. Kingsley International Pictures Corp. v. Regents of Univ. of N. Y., 360 U.S. 684, 79 S.Ct. 1362, 3 L.Ed.2d 1512 (1959).

In pre-*Jacobellis* cases, the Third District Court of Appeal approved a holding that "contemporary community standards" meant the "standards in Dade County," Gerstein v. Pleasure Was My Business, 136 So.2d 8, 9 (Fla. 3d D.C.A., 1962), and affirmed a decree applying such standards, Tralins v. Gerstein, 151 So.2d 19 (Fla. 3d D.C.A., 1963). The latter case was reversed, per curiam, by the United States Supreme Court. Tralins v. Gerstein, 378 U.S. 576, 84 S.Ct. 1903, 12 L.Ed.2d 1033 (1964).

After *Jacobellis*, the Florida courts continued to construe the statute to mean only local standards. In Felton v. City of Pensacola, 200 So.2d 842, 848 (Fla. 1st D.C.A., 1967), the court held that the standards were those of the City of Pensacola:

> [T]he test of obscenity recognized in the Roth case, supra, is whether "to the average person, applying contemporary community standards" the dominant theme of the material taken as a whole appeals to prurient interest. *Certainly the judge of the Municipal*

11. Defendants stipulated that *Jacobellis. supra,* dictates a national standard, but deny that the Florida courts have authoritatively ruled otherwise. The amicus brief asserts that six federal Courts of Appeals and four states have followed a national standard, that three states have adopted a statewide standard, that five states, including Florida, have retained a local community standard, and that four states are confused in what standard controls. The amicus brief relies, for support of its contention that the lack of a national standard does not present a federal question, on the recent denial of certiorari of two cases, both involving nightclub performances. California v. Giannini, 395 U.S. 910, 90 S.Ct. 1743, 23 L.Ed.2d 223 (1969); Jones v. City of Birmingham, 396 U.S. 1011, 90 S.Ct. 553, 24 L.Ed.2d 504 (1970). Even if the facts were similar to those in the case at bar, such denials do not imply a ruling on the merits. Maryland v. Baltimore Radio Show, Inc., 338 U.S. 912, 918, 70 S.Ct. 252, 94 L.Ed. 562 (1950). The Court's opinion in *Jacobellis* should have put to rest the contentions of the amicus brief:

> The Court has explicitly refused to tolerate a result whereby "the constitutional limits of free expression in the Nation would vary with state lines," * * * ; we see even less justification for allowing such limits to vary with town or county lines. (Citation omitted) *Id.* 378 U.S. at 194–195, 84 S.Ct. at 1682.

*Court of the City of Pensacola is in a much better position than the members of this court to know the "contemporary community standards" prevailing in the said city, where the alleged offenses took place. Id.* at 848 (emphasis added).[12]

The Supreme Court of Florida denied certiorari, Felton v. City of Pensacola, 204 So.2d 210 (Fla., 1967), and the United States Supreme Court reversed, per curiam, on March 11, 1968. Felton v. City of Pensacola, 390 U.S. 340, 88 S.Ct. 1098, 19 L.Ed.2d 1220 (1968).

That reversal *non obstante,* and despite the issue being squarely presented to him, *see* Brief of Appellants, filed July 5, 1967, pp. 12–13, (Exhibit 11, in evidence), the same judge, on July 11, 1968, held that "contemporary community standards" were the standards of Escambia County (which includes the City of Pensacola):

> The judge of the Court of Record was, under our law, the trier of the facts, and we have no authority to substitute our judgment for his on questions of fact, even if we wished to. Observation of this rule is particularly important here, because *the test of obscenity depends upon community standards, and the judge and other citizens of the community are better equipped to know those standards than appellate judges living far away.*

Along with the judge, 18 citizens of Escambia County saw the film and testified as to their reactions to it. Nissinoff v. Harper, 212 So.2d 666, 668 (Fla. 1st D.C.A., July 11, 1968).

The Supreme Court of Florida denied certiorari, Nissinoff v. Harper, 221 So. 2d 747 (Fla., 1968), and no appeal was taken, for in the fifteen months between the trial decree and the appellate decision the theatre burned down, making the case moot. Affidavit of Alan H. Rosenbloum, Exhibit 12.

The constitutional necessity for a national, as opposed to a local, standard is apparent not only because "[i]t is, after all, a national Constitution we are expounding," Jacobellis v. Ohio, *supra,* 378 U.S. at 195, 84 S.Ct. at 1682, but also because of the unevenness of censorship permitted by a local standard, making criminal to show in one part of the state, or of the nation, that which is legal in another (an equal protection rationale), and because of the inevitable consequence of chilling the dissemination of protected expression (a first amendment basis). Moreover, this national standard is not a national "average" of permissibility that would result in half of the nation being brought under the more repressive standards of the other half, thereby depriving that public of access to expression permitted in their own locale. Although the contours of the national standard may be imprecise, the first amendment guarantee is a fundamental one that protects interstate (and intrastate) expression from the vagaries of local censorship and political opportunism.

Since the statute has been interpreted in a manner contrary to the Supreme Court's ruling in *Jacobellis,* and the state has persisted in that interpretation, we do not find evidence of sufficient willingness by the state courts to change their view so as to be in accord with *Jacobellis,* and therefore we decline to abstain from holding the statute unconstitutional. Moreover, a contrary ruling by this Court to the position the Florida courts have taken would not necessarily be followed by them.[13]

---

12. This statement demonstrates the difficulty of review where the standards are not articulated or proven. It is contended in Batchelor v. Stein, 396 U.S. 954, 90 S.Ct. 428, 24 L.Ed.2d 419 (1969) (prob. juris. noted), that the standards of "redeeming social value" must be pleaded and affirmatively proven by the prosecution. Here we consider only whether the standard is local or national, not whether it must be pleaded and proven by the state.

13. For example, the First District Court of Appeal recently upheld the Jacksonville vagrancy ordinance despite a three-

### 3. *Failure of the State to Provide for Prompt Appellate Consideration*

Although section 847.011(7) (b), (c), provides for an expedited trial procedure to minimize incursions on the right of protected expression, the statute makes no provision whatever for an expedited appellate consideration by the District Courts of Appeal, the courts of final jurisdiction in most cases. Because no prompt review is specified by law, an unwarranted delay can occur before a final decision is reached, and during that delay the evanescent right of freedom of expression may be lost.

The appeal procedure is vitally related to freedom of speech, for in Florida either party in a civil censorship proceeding may appeal. The state has recently taken such appeals from lower court rulings. *E. g.*, State ex rel. Hallowes v. Reeves, 224 So.2d 285 (Fla., 1969); State v. Reese, 222 So.2d 732 (Fla., 1969) (reinstating two criminal informations which had been dismissed by the trial judge on the grounds that section 847.011 failed to prescribe a sufficiently ascertainable standard of guilt). An adverse ruling by the trial court may mean that speech will be chilled until it is vindicated on appeal. On the other hand, the citizen whose expression is found to be protected by the circuit court may nonetheless be chilled by the unresolved prosecution for whatever period the state's appeal consumes. Florida Appellate Rule 5.12, 32 F.S.A., provides that no supersedeas bond is required of the state unless required by court order. Thus, an initial civil finding that the material is not obscene does not protect further expression during an appeal taken by the state. For instance, in this case, the

chilling effect was demonstrated in exhibitor Mandell's testimony that he would not risk showing the film until after a successful appeal, regardless of whether he won or lost at the trial level.[14]

In the recent past, appeals from trial decisions in Florida obscenity cases have consumed inordinate lengths of time. Docket sheets in evidence trace the slow progress of two decisions by the First District Court of Appeal: Felton v. City of Pensacola, 200 So.2d 842 (Fla. 1st D.C.A., 1967), cert. denied, 204 So.2d 210 (Fla., 1967), rev'd per curiam, 390 U.S. 340, 88 S.Ct. 1098 (1968); Nissinoff v. Harper, 212 So.2d 666 (Fla. 1st D.C.A., 1968), cert. denied, 221 So.2d 747 (Fla., 1968) (right of petition to United States Supreme Court mooted by theatre fire during appeal).

In *Felton*, after the trial court entered its judgment on February 28, 1966, the District Court of Appeal docketed the appeal for oral argument two months and two days after appellants' briefs were submitted. It rendered its decision eight months and four days after oral argument. The appellate decision, on July 6, 1967, came more than one year and four months after the trial court entered its judgment.

In *Nissinoff*, the trial court entered its judgment on March 14, 1967, the arguments before the District Court of Appeal were set only after two months and six days had elapsed after all briefs were submitted, and the court rendered its decision on July 11, 1968, more than one year and three months after the trial court entered its judgment, and it denied rehearing on August 14, 1968. The theatre burned down before a petition for writ of certiorari could be made to the United States Supreme Court.

judge district court's decision striking the substantially similar Florida vagrancy statute as unconstitutional. Lazarus v. Faircloth, 301 F.Supp. 266 (S.D.Fla., 1969) (3 judge court), appeal taken, No. 630, 38 U.S.L.W. 3225. The Florida court stated: "A decision of a Federal District Court, while persuasive if well reasoned, is not by any means binding

on the courts of a state." Brown v. City of Jacksonville, 236 So.2d 141 (Fla. 1st D.C.A., filed June 9, 1970).

14. "Particularly in the case of motion pictures, it may take very little to deter exhibition in a given locality." Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).

The unnecessary and unconstitutional chilling effect of this delay in the appeals is apparent from the *Felton* and *Nissinoff* cases, both begun and decided after the United States Supreme Court had established that any censorship process must provide for a "prompt final judicial decision." Freedman v. Maryland, 380 U.S. 51, 59, 85 S.Ct. 734 (1965). In *Freedman*, it was stated:

> Risk of delay is built into the Maryland procedure, as is borne out by experience; in the only reported case indicating the length of time required to complete an appeal, the initial judicial determination has taken four months and *final vindication of the film on appellate review, six months. Id.*, at 55, 85 S.Ct. at 737 (emphasis added and citation omitted).

The State of Maryland subsequently amended its statute to require advanced hearings on appeal. In a case brought in Maryland after amendment, the final judicial determination, including appellate review, came in less than three months. Trans-Lux Distr. Corp. v. Maryland State Board of Censors, 240 Md. 98, 213 A.2d 235 (1965). After a Dallas ordinance was similarly invalidated for failure to provide for a speedy review, Interstate Circuit, Inc. v. City of Dallas, 247 F.Supp. 906 (N.D.Tex., 1965), the ordinance was amended to require the censorship board to waive all statutory notice of appeal and times for appeal, to file its brief in ten days, and to request advanced consideration by the appeals court. A subsequent appellate decision was reached in less than two months, on April 5, 1966, after the case had been initially filed on February 14, 1966. Interstate Circuit, Inc. v. City of Dallas, 402 S.W. 770 (Tex.Civ.App., 1967), rev'd on other grounds, 390 U.S. 676, 88 S.Ct. 1298, 20 L.Ed. 225 (1968). Apart from the ordinance's concern only with viewing by juveniles under sixteen years of age, the shortness of the appellate proceeding in that case accounts for the Supreme Court's language which seems to indicate that a speedy trial is all that is constitutionally required. *Id.*, at 690 n. 22, 88 S.Ct. 1298. That footnote itself refers to the Supreme Court's decision in Teitel Film Corp. v. Cusack, 390 U.S. 139, 141–142, 88 S.Ct. 754, 756, 19 L.Ed.2d 966 (1968), which quoted *Freedman, supra,* 380 U.S. at 58–59, 85 S.Ct. 734 with emphasis: "[T]he procedure must also assure a *prompt final judicial decision,* to minimize the deterrent effect of an interim and possibly erroneous denial of a license." (emphasis by the Supreme Court).[15]

In deference to the wide choice of acceptable procedures that the Legislature might devise to protect the right of free expression while an appeal is being taken, we decline to prescribe what specific procedures must be used.

15. The defendants contend that the state statute cannot be held defective for failure to provide for a speedy appeal because the federal customs statute, 19 U.S.C. § 1305, does not provide for a speedy appeal. *See* United States v. One Carton Positive Motion Picture Film Entitled "491," 2 Cir., 367 F.2d 889, 898–904 (1966). A review of such cases reveals that in some of them imported material was released pending review. United States v. One Book Entitled "The Adventures of Father Silas," 249 F.Supp. 911 (S.D.N.Y., 1966), or in others the importers caused the delay, *e. g.*, United States v. A Motion Picture Entitled "Pattern of Evil," 304 F.Supp. 197 (S.D. N.Y., 1969); United States v. A Motion Picture Entitled "I am Curious-Yellow," 285 F.Supp. 465, 469 (S.D.N.Y., 1968), rev'd 404 F.2d 196 (2d Cir., 1968). In the customs cases, federal courts are given the latitude to construe and apply the statute in obedience to the dictates of Freedman v. Maryland, *supra. See* United States v. A Motion Picture Entitled "Pattern of Evil," *supra,* 304 F.Supp. at 200; United States v. 392 Copies of Magazine Entitled "Exclusive," 253 F. Supp. 485 (D.Md., 1966). aff'd, 373 F.2d 633 (4th Cir., 1967), rev'd sub nom. Central Magazine Sales v. United States, 389 U.S. 50, 88 S.Ct. 235, 19 L.Ed.2d 49 (1967), but federal courts cannot save a state statute by a similar construction where the evidence conclusively demonstrates that the state courts have chosen not to comply with *Freedman.*

4. *Failure of the Statute to Include a Statement of the* Memoirs *Test*

It was asserted in the complaint and argued in post-hearing memoranda that the Florida statute is constitutionally defective because, on its face, it is overbroad for failure to include the additional A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966), requirement for obscenity that the material be without socially redeeming value. Plaintiffs also contend, with some force, that the recent decision of the Florida Supreme Court, upholding section 847.011, in State v. Reese, 222 So.2d 732 (Fla., 1966), does not guarantee that the *Memoirs* modification of *Roth* will be read into the statute as the "majority" opinion in *Reese* purports to do. The *Reese* court's opinion was concurred in by all six members of the court, but three of them specially concurred, stating that, in their opinion, the post-*Roth* pronouncements by the United States Supreme Court (and particularly the *Memoirs* addition) provided no clear modification of *Roth*, and possessed "no dignity as * * * judicial precedent." Furthermore, they stated that the "redeeming social value" test was merely so much "hocus-pocus. [*sic*]" *Id.*, at 738. Although if this attitude were to prevail there would be little assurance that constitutionally guaranteed expression would be protected, we will accept the "majority" opinion of the court and presume that the Florida courts would have interpreted the Florida obscenity law in light of the *Memoirs* standards. A similar confidence in the Florida courts was stated by Morrison v. Wilson, 307 F. Supp. 196 (N.D.Fla., 1969) 3 judge court), in its construction of a companion obscenity statute, section 847.06. If a revised statute is enacted, the addition of the *Memoirs* test is but one of several modifications that should be made so

that adequate notice is given in the statute of the standards to be applied. *See* Great Speckled Bird, etc. v. Stynchcombe, 298 F.Supp. 1291 (N.D.Ga., 1969).

5. *The State of Florida Has No Interest in Preventing Forewarned Adults, Absent Pandering, from Deciding for Themselves What Films They Wish to See*

Plaintiffs assert that the State of Florida has no interest in preventing adults, who are forewarned of the film's contents, absent pandering, from choosing what they may see, citing Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); Karalexis v. Byrne, 306 F.Supp. 1363 (D.Mass., 1970), prob. juris. noted, Byrne v. Karalexis, 397 U.S. 985, 90 S.Ct. 1123, 25 L.Ed.2d 394 (1970); *see* Roth v. United States, 354 U.S. 476, 510–511, 77 S.Ct. 1304, 1 L.Ed. 2d 1498 (1957) (Douglas, J. dissenting). Considerable commentary has recently been evoked by this position. Engdahl, Requiem for Roth: Obscenity Doctrine is Changing, 68 Mich.L.Rev. 185 (1969); Henkin, Morals and the Constitution: The Sin of Obscenity, 63 Colum.L.Rev. 391 (1963); Morreale, Obscenity: An Analysis and Statutory Proposal, 1969 Wis.L.Rev. 421; The Supreme Court, 1968 Term, 83 Harv.L.Rev. 7, 147–54 (1969); Note, Obscenity and the Law: An Appraisal of the Contemporary Concept of Obscenity, 1 Seton Hall L.Rev. 99 (1970); Comment, Stanley v. Georgia: New Directions in Obscenity Regulation, 48 Tex.L.Rev. 646 (1970); *see* Katz, Free Discussion v. Final Decision: Moral and Artistic Controversy and the Tropic of Cancer Trials, 79 Yale L.J. 209 (1969); Krislov, From Ginzberg to Ginsberg: The Unhurried Children's Hour In Obscenity Litigation, 1968 Sup.Ct.Rev. 153. In light of the ruling that is made here, it is unnecessary to reach this contention at this time.[16]

---

16. Plaintiffs seem, in essence, to argue that no rational basis has been shown for the state to exclude any expression from forewarned adults in the absence of pandering. *See* Henkin, Morals and the Constitution: The Sin of Obscenity, *supra*. This due process contention (fourteenth amendment) differs in origin

Not reached by this ruling is Florida Statutes, section 847.012 (1967), prohibiting sale or distribution of obscenity to persons under eighteen years of age. *See* Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968). Nor does this decision reach the question of the alleged obscenity of the film which, for the reasons underlying this decision, the Court has found it unnecessary to witness; and the transcript with pictures of the film is therefore irrelevant and is ordered stricken from the amicus brief and returned to Citizens for Decent Literature, Inc.

This Court is keenly mindful that pornographic films and publications often devoid of redeeming social or literary value, are being distributed throughout this state and nation. This problem should perhaps receive study and appropriate constitutional action by Congress and the legislatures.

A separate order consistent with the above will be entered simultaneously with this opinion, remitting the remaining questions of fact and damages not considered here to the requesting judge.

GEORGE C. YOUNG, J., dissents by separate opinion.

## JUDGMENT

For reasons assigned in Judge McRae's opinion for the majority of this Court, filed herein this day (Judge Young dissenting by separate opinion), it is

Ordered:

1. Florida Statutes, section 847.011 (1967), F.S.A. is declared to be unconstitutional in its entirety, and defendants, their employees, agents and attor-

neys are hereby permanently enjoined from enforcing its civil and criminal provisions.

2. The order to show cause entered herein on February 13, 1970, is discharged.

3. The transcript, with pictures, of "Vixen" is found to be irrelevant for purposes of this case, and it is ordered stricken from the amicus brief and returned to Citizens for Decent Literature, Inc.

4. Remaining issues not considered by this panel are hereby remitted to the requesting judge for such further proceedings as may be necessary.

## ORDER AND AMENDMENT TO JUDGMENT

PER CURIAM.

ORDERED:

1. Defendants' motion for new trial or stay is hereby denied.

2. Plaintiffs' motion to amend judgment is granted and in lieu of paragraph 1 of the judgment heretofore entered in this cause on July 22, 1970, the following paragraph shall be substituted:

1. Florida Statutes, section 847.011 (1967), F.S.A. is declared to be unconstitutional in its entirety, and defendants, their employees, agents and attorneys, including the Honorable Earl Faircloth, Attorney General of the State of Florida, and those persons in active concert or participation with them who receive actual notice of this judgment by personal service or otherwise, are hereby permanently enjoined from enforcing its civil and criminal provisions in this case and in cases begun after the date of this judgment.

from the privacy rationale of Karalexis v. Byrne, or *Stanley, supra* (grounded in the first, fourth, and perhaps ninth amendments, and applied to the states through the fourteenth amendment's due process clause). Recent decisions in other areas may lend collateral support to the privacy argument. Buchanan v. Batchelor, 308 F.Supp. 729 (N.D.Tex., 1970)

(consensual sodomy protected under first amendment); Babbitz v. McCann, 310 F. Supp. 293 (E.D.Wis., 1970) (3 judge court) (holding unconstitutional state abortion statute as invasion of woman's privacy); ·see Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed. 2d 510 (1965).

GEORGE C. YOUNG, District Judge.

I dissent, for the reasons set forth in my dissent filed July 23, 1970.

GEORGE C. YOUNG, District Judge (dissenting):

I dissent from both the opinion and decision rendered by the majority in this case and I therefore respectfully declined to approve the judgment.

This case arose because of efforts by Florida state officials to enforce Section 847.011 of the Florida Statutes, F.S.A. as related to the motion picture film "Vixen." The state sought in Florida ex rel Austin v. Mandell, No. 69–8106–H (4th Judicial Cir.Ct., Duval Cty., Fla.) to have "Vixen" declared obscene and to have it confiscated and destroyed. Upon the subsequent filing of this case, Judge McRae entered a one-judge temporary restraining order restraining the defendants against further acts to enforce Section 847.011 which was, in effect, an injunction restraining the state suit.

The plaintiffs here seek a declaratory judgment holding Section 847.011 to be unconstitutional and for an injunction permanently enjoining the defendants from enforcing the civil or criminal provisions of that statute. For the reasons hereinafter stated I consider the action of the majority of this Court in granting the requested relief to be without legal support.

The three reasons given by the majority opinion for declaring the whole statute unconstitutional are:

(1) The statute authorizes seizure of matter allegedly obscene before a prior, judicially supervised, adversary proceeding is held on the question of obscenity;

(2) The statute as interpreted by Florida courts prescribes a local standard (instead of a national one) for the identification of obscenity; and

(3) The statute, nor any other Florida statute, rule or practice, assures a prompt final judicial determination of "obscenity" on appeal.

### 1. *Provision for Ex Parte Injunction*

The majority opinion equates the seizure of any obscene material with a mass seizure of books, relying on A Quantity of Copies of Books v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964) and subsequent cases, including Carroll v. City of Orlando, 311 F.Supp. 967 (M.D.Fla., 1970) (three judge court). The author of this opinion dissented in the *Carroll* case believing that a mass seizure of books as in *Kansas*, supra, was not the same as a seizure of an instrumentality and evidence of a crime. The dissenting view in *Carroll* has subsequently been inferentially approved by the Supreme Court by its affirmance of Milky Way Productions, Inc. v. Leary, 305 F.Supp. 288 (S.D.N.Y., 1969) (three judge court), affirmed per curiam 397 U.S. 98, 90 S.Ct. 817, 25 L.Ed.2d 78 (1970). In *Milky Way* the three judge court said, 305 F.Supp. pp. 296–297:

" * * * we can and do go directly to the asserted requirement of a preliminary adversary hearing and decide the essentially identical question under either formulation—whether such a novelty is mandated by the First Amendment.

"While what plaintiffs propose is indeed a relative 'novelty,' their argument is not without arguable connection to established principles. Plaintiffs rely upon the decisions which have condemned mass, or broadly effective, seizures of allegedly obscene writings without a prior adversary hearing. A Quantity of Books v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964); Marcus v. Search Warrant, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961); Bethview Amusement Corp. v. Cahn, 416 F.2d 410 (2d Cir. 1969); Tyrone, Inc. v. Wilkinson, 410 F.2d 639 (4th Cir. 1969); Metzger v. Pearcy, 393 F.2d 202 (7th Cir. 1968). A 'prior restraint' is also effected plaintiffs say, when arrests are made—particularly multiple arrests for promoting the same publication—because this inhibits others from continuing to distribute the materials. And so, the argu-

ment concludes, there must be an adversary hearing and judicial determination preceding the inception of the criminal process.

"The argument is not merely plausible; it has won approval in several courts. Delta Book Distributors v. Cronvich, Inc., 304 F.Supp. 662 (E.D.La.1969) (three-judge court); Cambist Films, Inc. v. State of Illinois, 292 F.Supp. 185 (N.D. Ill.1968); Sokolic v. Ryan, 304 F.Supp. 213 (S.D.Ga.1969). But decisions we believe to be sounder, at least in the present state of learning, go the other way. Tyrone, Inc. v. Wilkinson, 410 F.2d 639 (4th Cir. 1969); Rage Books, Inc. v. Leary, 301 F.Supp. 546 (S.D.N.Y.1969), appeal pending; Astro Cinema Corp., Inc. v. Mackell, 305 F.Supp. 863 (E.D. N.Y.1969); East Village Other, Inc. v. Koota, 305 F.Supp. 1159 (E.D.N.Y. 1968). In the respect here pertinent, we join the latter group.

"It is of interest in this connection if by no means decisive, that plaintiffs' theory, if accepted, would have invalidated both federal and state convictions under obscenity statutes which have in the recent past been upheld by the Supreme Court. Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968); Mishkin v. New York, 383 U.S. 502, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966); Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966). A point of greater importance, both as a matter of legal history and practical judgment, is the fact that the prior adversary proceeding plaintiffs demand would not serve to eliminate either the 'chill' or the 'prior restraint' against which they contend. It does not appear that there were any arrests in the present cases before a judicial officer had scrutinized the materials and determined that warrants should issue. All that, like the proceedings of a grand jury, was accomplished ex parte—without either the possible benefit to the accused or the potentially 'chilling' effect upon others of adversary proceedings. The result, at least in terms of history, is to avoid any traditional form of 'prior restraint' because

the first overt impact upon the allegedly protected area comes at a time when all the protections and favorable presumptions of the criminal process are available to the defendant. Cf. Near v. Minnesota, 283 U.S. 697, 713–714, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).

"This is not to blink at the undeniable fact that arrests and prosecutions are likely to deter activities of the kind against which they are directed. The very existence of criminal sanctions for forms of expression, especially when the standards of liability are such vexed questions at the highest judicial levels, must have some appreciable tendency of the same type. See Smith v. California, 361 U.S. 147, 154–155, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959). The point remains that the inhibitions are not avoided by the new procedure plaintiffs want; they are, if anything, pushed back to an earlier time of open contest when the burden of litigation and a species of readier 'defeat' are likely to work their deterrent effects.

"It is inappropriate, we think, to 'weigh' (assuming we could) the relative impact of familiar criminal procedures against the innovation plaintiffs seek. It seems sufficient for our purposes that the supposed virtues of the departure they urge are not at all apparent and are directly antithetical to all pertinent indications in the Supreme Court's pronouncements implementing the First Amendment. The net effect of those expressions suggests that traditional criminal prosecutions, with their procedural safeguards, are surely permissible, and very possibly preferred, vehicles for enforcing bans against obscenity. See Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 69–70, 83 S.Ct. 631, 9 L.Ed. 2d 584 (1963); Id. at 72–73, 83 S.Ct. at 640–641 (Douglas, J., concurring); Freedman v. Maryland, 380 U.S. 51, 58–59, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); Kingsley Books, Inc. v. Brown, 354 U.S. 436, 441–443, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1957); Near v. Minnesota, 283 U. S. 697, 713–715, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). *Bantam Books*, supra, up-

on which plaintiffs rely,· reminds us specifically that procedures short of prosecution, intended as potential substitutes, may be less acceptable than the standard proceeding that begins with complaint, information or indictment as the first, non-adversary determination.

"At any rate, we find no warrant in the First Amendment or the cases that give it full meaning for compelling the radical change plaintiffs seek in state (and presumably, federal) criminal procedures affecting obscenity cases."

Despite the affirmance of *Milky Way* by the Supreme Court, as above noted, the majority opinion continues to apply the law proscribing mass· seizures of books to seizures of a single film and attributes the Supreme Court's affirmance to the plaintiffs' delay in that case to seek federal injunctive relief.

It is true that *Milky Way* concerned an arrest and not a seizure but the reasoning is equally applicable to both arrest and seizure. In the recent case of United States v. Fragus, 428 F.2d 1211 [filed June 23, 1970], supplementing 422 F.2d 1244 (5th Cir. 1970) (per curiam) the Fifth Circuit said:

"That Court [U. S. Supreme Court] affirmed the decision of a three-judge district court in Milky Way Productions, Inc. v. Leary, 305 F.Supp. 288 (S.D.N.Y.1969); aff. 397 U.S. 98, 90 S.Ct. 817, 25 L.Ed.2d 78 (1970), which confirms that the arrest of a panderer of gross smut may be effected under ordinary criminal processes without a prior judicial determination of the obscenity of the materials he peddles. While acknowledging the restraining effect of such an arrest, that opinion distinguishes the arrest from mass, or broadly effective seizures of allegedly obscene writings such as were involved in A Quantity of Copies of Books v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964) and Marcus v. Search Warrants of Property, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed. 2d 1127 (1961). It has also come to our attention that the Second Circuit in United States v. Wild, 422 F.2d 34 (2nd Cir. 1969), affirmed convictions under Title 18, § 1461, United States Code, a companion section of the Comstock Act to the statute violated here. There the Second Circuit said:

' * * * appellants present a broader argument that seizures in an obscenity case without a prior adversary hearing on the issue of obscenity are unconstitutional under A Quantity of Books v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed. 2d 809 (1964), and Marcus v. Search Warrants of Property, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961). These cases are inapposite since they involved massive seizures of books under state statutes which authorized warrants for the seizure of obscene materials as a first step in civil proceedings seeking their destruction. The seizures in this case were of instrumentalities the evidence of the crime for which appellants were indicted and lawfully arrested. We do not believe Marcus and A Quantity of Books can be read to proscribe the application of the ordinary· methods of initiating criminal prosecution to obscenity cases.'

"In particular, see that court's opinion on petition for rehearing which details the distinctions between the seizure which occurred in that case (which is closely similar to the seizure involved in the case at bar) and its prior decision in Bethview Amusement Corp. v. Cahn, 416 F.2d 410 (2d Cir. 1969).

We agree with the Second Circuit that there is no broader protection against seizure of obscenity of the type here involved than there would be against arrest of the procurer who is transporting it, since the Fourth Amendment speaks to unreasonable seizures of persons and papers and effects in precisely the same terms."

Whether the plaintiffs—or any of them—were pandering in this case is a factual matter which does not go to the

basic issue of the constitutionality of the statute.

In short, it is my position that a prior, judicially supervised, adversary proceeding is not required except where seizures come within the proscriptions of A Quantity of Copies of Books v. Kansas, *supra,* and that, therefore, the statute is not invalid on that ground.

2. *Local Standard Instead of National Standard*

The Supreme Court has held that obscenity is not within the area of constitutionally protected speech or press. Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). In A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of Com. of Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966) the Court states that their definition of obscenity required that three elements must coalesce (p. 418, 86 S.Ct. p. 977):

"(a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex;

(b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and

(c) the material is utterly without redeeming social value."

The majority opinion in the case at bar concludes that in Jacobellis v. Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) the phrase "contemporary community standards" was defined by the Supreme Court as meaning a national standard of contemporary values. The opinion of Mr. Justice Brennan setting forth that definition was concurred in by only Mr. Justice Goldberg; Chief Justice Warren and Mr. Justice Clark specifically stated their view that "community standards" meant community standards—not a national standard.

I am therefore not as sure as my brothers that the law is absolutely clear on that point. But even assuming they are correct and that in determining the issue of obscenity that a national standard should be used, the statute should not be invalidated because a state court has failed to apply correctly a Supreme Court ruling. Reversals of convictions improperly attained is the appropriate remedy—not striking the whole statute to make sure it cannot be applied incorrectly. The majority approach on this issue is in my opinion novel, unnecessary, and unauthorized. The statute should not have met its demise on that point.

3. *No Provision For Appeal*

The majority opinion cites and quotes from Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965) as supporting the third ground on which the Florida statute is stricken. A reading of *Freedman* discloses the following statement by Mr. Justice Brennan in the Court's opinion, p. 55, 85 S.Ct. p. 737:

"Under the [Maryland] statute, the exhibitor is required to submit the film to the Board for examination, but no time limit is imposed for completion of Board action."

The Maryland statute provided for administrative determination of obscenity without any judicial participation. The Florida statute does not suffer from the infirmity of *Freedman* because Section 847.011(7) (c) provides:

"The person sought to be enjoined shall be entitled to a trial of the issues within one day after joinder of issue and a decision shall be rendered by the court within two days of the conclusion of the trial."

In *Freedman* the Supreme Court referred to their previous opinion in Kingsley Books, Inc. v. Brown, 354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1957) as containing a model procedure for the safeguards found lacking in *Freedman.* That model was incorporated in the New York Criminal Code of Criminal Procedure as Section 22–a thereof and it appears that the civil portion of the Florida statute is substantially the same.

Insofar as factual delays are concerned in this case, it would be reasonable to

assume that, if left alone, the state procedures would long ago have determined the issue of obscenity; it was the resort to the staying hand of the federal court which has prevented an early determination of Vixen's status. I am unable to agree that *Freedman* requires a finding that the Florida statute is constitutionally deficient because it does not provide a specific appellate procedure; I find no other reference to a Supreme Court case in the majority opinion in support of the position of the majority on that issue.

In addition to believing that the statute is not unconstitutional on the grounds stated by the majority, there is another reason for my declining to join in the judgment enjoining all enforcement of the civil and criminal provisions of § 847.011 Florida Statutes, F.S.A. As noted above, when this case was first filed, Judge McRae entered a one-judge temporary restraining order which had the effect of restraining the state suit then pending wherein T. Edward Austin as the State Attorney for the Fourth Judicial Circuit of Florida, had brought a civil proceeding against the exhibitor Mandell of the film Vixen under the civil provisions of § 847.011. The effect of the permanent injunction is to continue in force the temporary restraining order staying the state proceedings. To the extent that the injunction applies to the case of Florida ex rel Austin v. Mandell, No. 69–8106–H (4th Judicial Cir.Ct., Duval Cty., Fla.) or to any other presently pending case, I conclude that Atlantic Coast Line Railroad Co. v. Brotherhood of Locomotive Engineers, 398 U.S. 281, 90 S.Ct. 1739, 26 L.Ed.2d 234 (June 8, 1970) precludes such action.

Title 28, United States Code, § 2283 provides:

"A court of the United States may not grant an injunction to stay proceedings in a state court except as expressly authorized by an Act of Congress or where necessary in aid of its jurisdiction or to protect or effectuate its judgments."

In *Atlantic Coast Line,* the Supreme Court stated:

" * * * a federal court does not have inherent power to ignore the limitations of § 2283 and to enjoin state court proceedings merely because those proceedings interfere with a protected federal right or invade an area preempted by federal law even when the interference is unmistakeably clear."

Therefore, even if the reasoning of the majority is correct—which I do not concede—the relief granted is over broad in the light of *Atlantic Coast Line.*

In Kingsley Books, Inc. v. Brown, *supra,* Mr. Justice Frankfurter stated:

"In an unbroken series of cases extending over a long stretch of this Court's history, it has been accepted as a postulate that 'the primary requirements of decency may be enforced against obscene publication' * * * It is not for this Court thus to limit the state in resorting to various weapons in the armory of the law. Whether proscribed conduct is to be visited by a criminal prosecution or by a qui tam action or by an injunction or by some or all of these remedies in combination is a matter within the legislator's range of choice."

The majority opinion directs the return to the Citizens for Decent Literature, Inc., of a transcript with pictures of the film Vixen which that organization had filed with the Court as amicus curiae. The question of obscenity of that film has not been resolved by this Court or the majority opinion. In fact, that was properly an issue before the state court which has been divested of its authority on that issue by this Court. An examination of the transcript and pictures of the film clearly reveals that it was subject to the challenge of obscenity and while this opinion makes no effort to make such a decision, it is unfortunate that the state court was not permitted to finally determine this issue.

"Chilling" of First Amendment rights is, of course, proscribed by the Constitu-

tion. But obscenity does not have such protection and the "chilling" of obscenity is not only permissible but a legitimate interest of the state. The majority opinion expresses concern over the finding that the state proceeding "chilled" the rights of Vixen's promoters. But who can say from the record that such "chilling" was not justified in the state's efforts to suppress obscenity?

## APPENDIX I

## FLORIDA STATUTES, 1967

### CHAPTER 847

### *OBSCENE LITERATURE; PROFANITY*

*847.011 Prohibition of certain acts in connection with obscene, lewd, etc., materials; penalty.—*

(1) (a) A person who knowingly sells, lends, gives away, distributes, transmits, shows or transmutes, or offers to sell, lend, give away, distribute, transmit, show or transmute, or has in his possession, custody, or control with intent to sell, lend, give away, distribute, transmit, show, transmute, or advertise in any manner, any obscene, lewd, lascivious, filthy, indecent, immoral, sadistic, or masochistic book, magazine, periodical, pamphlet, newspaper, comic book, story paper, written or printed story or article, writing, paper, card, picture, drawing, photograph, motion picture, film, figure, image, phonograph record, or wire or tape or other recording, or any written, printed, or recorded matter of any such character which may or may not require mechanical or other means to be transmuted into auditory, visual, or sensory representations of such character, or any article or instrument of indecent or immoral use, or purporting to be for indecent or immoral use or purpose; or who knowingly designs, copies, draws, photographs, poses for, writes, prints, publishes, or in any manner whatsoever manufactures or prepares any such material, matter, article, or thing of any such character; or who knowingly writes, prints, publishes, or utters, or causes to be written, printed, published, or uttered, any advertisement or notice of any kind, giving information, directly or indirectly, stating, or purporting to state, where, how, of whom, or by what means any, or what purports to be any, such material, matter, article, or thing of any such character can be purchased, obtained, or had; or who in any manner knowingly hires, employs, uses, or permits any person to do or assist in doing, either knowingly or innocently, any act or thing mentioned above, is guilty of a misdemeanor and shall be punished by imprisonment in the county jail not exceeding one year or by fine not exceeding $1,000.00, or both. A person who, after having been convicted of a violation of this section, thereafter violates any of its provisions, is guilty of a felony and shall be punished by imprisonment in the state prison not exceeding five years or in the county jail not exceeding one year or by fine not exceeding $10,000.00, or by both such fine and imprisonment.

(b) The knowing possession by any person of six or more identical or similar materials, matters, articles or things coming within the provisions of the foregoing paragraph (a) is presumptive evidence of the violation of said paragraph.

(2) A person who knowingly has in his possession, custody, or control any obscene, lewd, lascivious, filthy, indecent, immoral, sadistic, or masochistic book, magazine, periodical, pamphlet, newspaper, comic book, story paper, written or printed story or article, writing, paper, card, picture, drawing, photograph, motion picture film, figure, image, phonograph record, or wire or tape or other recording, or any written, printed, or recorded matter of any such character which may or may not require mechanical or other means to be transmuted into auditory, visual, or sensory representations of such character, or any article or instrument of indecent or immoral use, or purporting to be for indecent or immoral use or purpose, without intent to sell, lend, give away, distribute, transmit, show, transmute, or advertise the same, is guilty of a misdemeanor and

shall be punished by imprisonment in the county jail not exceeding six months or by fine not exceeding $500.00, or both. In any prosecution for such possession, it shall not be necessary to allege or prove the absence of such intent.

(3) No person shall as a condition to a sale, allocation, consignment, or delivery for resale of any paper, magazine, book, periodical, or publication require that the purchaser or consignee receive for resale any other article, paper, magazine, book, periodical, or publication reasonably believed by the purchaser or consignee to be obscene, lewd, lascivious, filthy, indecent, immoral, sadistic, or masochistic, and no person shall deny or threaten to deny or revoke any franchise or impose or threaten to impose any penalty, financial or otherwise, by reason of the failure of any person to accept any such article, paper, magazine, book, periodical, or publication, or by reason of the return thereof. Whoever violates this section is guilty of a felony and shall be punished by imprisonment in the state prison not exceeding five years or in the county jail not exceeding one year or by fine not exceeding $10,000.00, or by both such fine and imprisonment.

(4) Every act, thing, or transaction forbidden by this section shall constitute a separate offense and shall be punishable as such.

(5) Proof that a defendant knowingly committed any act or engaged in any conduct referred to in this section may be made by showing that at the time such act was committed or conduct engaged in he had actual knowledge of the contents or character of the material, matter, article, or thing possessed or otherwise dealt with, or by showing facts and circumstances from which it may fairly be inferred that he had such knowledge, or by showing that he had knowledge of such facts and circumstances as would put a man of ordinary intelligence and caution on inquiry as to such contents or character.

(6) There shall be no right of property in any of the materials, matters, articles, or things possessed or otherwise dealt with in violation of this section, and upon the seizure of any such material, matter, article, or thing by any authorized law enforcement officer the same shall be delivered to and held by the clerk of the court having jurisdiction to try such violation. When the same is no longer required as evidence, the prosecuting officer or any claimant may move the court in writing for the disposition of the same and after notice and hearing, the court, if it finds the same to have been possessed or otherwise dealt with in violation of this section, shall order the sheriff to destroy the same in the presence of the clerk; otherwise, the court shall order the same returned to the claimant if he shows that he is entitled to possession. If destruction is ordered, the sheriff and clerk shall file a certificate of compliance.

(7) (a) The circuit court has jurisdiction to enjoin a threatened violation of this section upon complaint filed by the state attorney, county solicitor, or county prosecuting attorney in the name of the state upon the relation of such state attorney, county solicitor, or county prosecuting attorney.

(b) After the filing of such a complaint, the judge to whom it is presented may grant an order restraining the person complained of until final hearing or further order of the court. Whenever the relator state attorney, county solicitor or county prosecuting attorney shall request a judge of said court to set a hearing upon an application for such a restraining order, such judge shall set such hearing for a time within three days after the making of such request. No such order shall be made unless such judge shall be satisfied that sufficient notice of the application therefor has been given to the party restrained of the time when and place where the application for such restraining order is to be made, provided, however, that such notice shall be dispensed with when it is manifest to such judge, from the sworn allegations of the complaint or the affidavit of the plaintiff or other competent

person, that the apprehended violation will be committed if an immediate remedy is not afforded.

(c) The person sought to be enjoined shall be entitled to a trial of the issues within one day after joinder of issue and a decision shall be rendered by the court within two days of the conclusion of the trial.

(d) In the event that a final decree of injunction is entered, it shall contain a provision directing the defendant having the possession, custody, or control of the materials, matters, articles, or things affected by the injunction to surrender the same to the sheriff and requiring the sheriff to seize and destroy the same. The sheriff shall file a certificate of his compliance.

(e) In any action brought as provided in this section, no bond or undertaking shall be required of the state or the state attorney or county solicitor or county prosecuting attorney before the issuance of a restraining order provided for by paragraph (b) of this subsection, and there shall be no liability on the part of the state or the state attorney or the county solicitor or the county prosecuting attorney for costs or for damages sustained by reason of such restraining order in any case where a final decree is rendered in favor of the person sought to be enjoined.

(f) Every person who has possession, custody, or control of, or otherwise deals with any of the materials, matters, articles, or things described in this section, after the service upon him of a summons and complaint in an action for injunction brought under this section, is chargeable with knowledge of the contents and character thereof.

(8) The several sheriffs, constables, state attorneys, county solicitors, and county prosecuting attorneys shall vigorously enforce this section within their respective jurisdictions.

(9) This section shall not apply to the exhibition of motion picture films permitted by § 521.02.

(10) For the purposes of this section, the test of whether or not material is obscene is: Whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest.

(11) For the purposes of this section, the word person includes individuals, firms, associations, corporations, and all other groups and combinations.

SUPPLEMENTAL STIPULATION

The parties agree that the following facts are true and need not be proved:

On or about August 28, 1969, pursuant to arrangements made with plaintiffs Meyer, the creator, director and producer of "Vixen," and Eve Productions, Inc., owner of the print involved, the plaintiffs Vaughan and Jack Vaughan Productions, Inc., the distributor, delivered to Sheldon H. Mandell a print of "Vixen" for exhibition at his Five Points Theater. On that date, Mandell began exhibiting the film to patrons of the theater and he continued to do so, without interruption and without incident, several times a day for five weeks and one day. Mandell restricted admission to persons eighteen years of age or older.

On October 3, 1969, the second day of the sixth week of the film's engagement, the defendant State Attorney and the defendant Sheriff and their agents obtained a search warrant and criminal summons from a judge of the State circuit court, without notice to Mandell or to anyone else interested in "Vixen," and proceeded to the Five Points Theater. The defendants and their agents notified the Jacksonville newspapers and a major commercial television station of the impending action to be taken. The television reporter so notified had viewed "Vixen" at the State Attorney's request and, believing it to be obscene, supplied an affidavit that was used in obtaining the warrant.

Newsmen and cameramen of the newspapers and the television station were in the vicinity of the theater when the law

officers arrived to execute the search warrant for "Vixen" and to execute on Mandell the criminal summons. The television reporter saw the officers arrive and followed them into the theater. The newspaper reporter and photographer did not see the officers arrive because they were in their car marked "Florida Times-Union and Journal," which for that reason they concealed around the corner. One of the reporters understood there would be a "signal" from the police officers. When police investigator John Boman saw that the newspaper reporter and photographer were not at the theater, he sent an unidentified passerby to notify them to come to the theater. So notified, they went to the theater. In the entryway of the theater, the newsmen witnessed and photographed Sergeant Pfeiffer of the "vice squad" reading the search warrant and the summons to Mandell.

Accompanied by a newsman, who entered the theater despite Mandell's request that the press not enter, the officers proceeded to the projection room. The showing of "Vixen" then in progress was stopped and the house lights turned on. The film was confiscated as Mandell's patrons left the theater, some by the back door. The cameramen photographed the officers as they carried away the film and they photographed Mandell as he telephoned his lawyer.

Investigator Boman returned to the lobby from the projection booth and handed a newspaper reporter a piece of paper on which Boman had written the projectionist's name and a comment attributed by Boman to the projectionist, "How come it took you so long to come and get it?" Boman or another officer supplied the same attributed quotation to the television reporter.

In two newscasts on the night of October 3 the viewers of Channel 12 heard the story of the seizure of "Vixen" and saw all the details on film. And the Florida Times-Union reported on Saturday, October 4th that " 'Vixen' Closed as Lewd Film" and that Mandell had been charged with an offense punishable by fine and imprisonment for up to one year.

This Court enjoined the criminal prosecution of Mandell based on the seizure without a prior adversary hearing, and required the defendants to return the film to Mandell.

After the film was returned to Mandell, the State Attorney commenced a civil proceeding against him in the State circuit court under Florida Statute 847.-011, seeking to have the film declared obscene and to have the film again confiscated and destroyed. After running the picture for a few days, to a theater packed with people who obviously were far more titillated by the State Attorney's charges than by what they had previously seen or heard of the film itself, Mandell gave up his defense of the film, withdrew it from the screen, agreed with the State Attorney not to show the film again. He offered to submit for the State Attorney's inspection and approval any "questionable" films he might desire to exhibit in the future. The State Attorney declined.